AO 91 (Rev. 01/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Rhode Island

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Juan Vasquez | ) | Case No. |
| | ) | *1:15MJ295A* |
| | ) | |
| _Defendant_ | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of _____ in the county of ___Providence___ in the _____ District of
___Rhode Island___ , the defendant violated ___18___ U. S. C. § ___see below___ , an offense described as follows:

Conspiracy to commit offenses angainst United States in violation of 18 U.SC. 371; theft of government property in violation of 18 U.S.C. 641; mail fraud in violation of 18 U.S.C. 1341; aggravated identity theft in violation of 18 U.S.C. 1028A; and money laundering in violation of 18 U.S.C 1956(a)(1)(B)(i).

This criminal complaint is based on these facts:

see attached affidavit, incorporated by reference.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Matthew Amsden, Special Agent IRS-CI
_Printed name and title_

Sworn to before me and signed in my presence.

Date:  __9/8/2015__

_____
_Judge's signature_

City and state:  _____Providence, RI_____

Hon Lincoln D. Almond, U.S. Magistrate Judge
_Printed name and title_

## AFFIDAVIT

I, Matthew R. Amsden, do, under oath, depose and say that:

1.     I am a Special Agent with Internal Revenue Service - Criminal Investigation ("IRS-CI"), and have been so employed since May 2009.  My responsibilities include the investigation of possible criminal violations of the Internal Revenue Laws covered under Title 26 of the United States Code and related offenses, particularly as found in Title 18 and Title 31 of the United States Code.  I have a Bachelor's Degree in Accounting and a Master's of Professional Accountancy degree from Bryant University.  In June of 2009, I attended the Federal Law Enforcement Training Center located in Glynco, Georgia, where I received training in the investigation of identity theft and related fraud, financial crimes, including but not limited to tax evasion, filing false tax returns, failure to file tax returns, money laundering and structuring, and financial fraud.  In addition, I was trained in the use of law enforcement techniques including the execution of arrest warrants as well as search and seizure warrants.

2.     I have assisted in numerous criminal investigations involving tax and other financial crimes.  Additionally, I personally participated in the execution of several arrest warrants related to a number of separate investigations. Through training and experience, I have become familiar with the types of records businesses typically maintain in the course of their regular activity, including ledgers, journals, invoices, receipts, bank documents, and client files. A large part of my duties as an IRS-CI special agent involve analyzing these types of documents to determine the existence of criminal

activity and to develop evidence of criminal activity.

3.　　This affidavit is submitted in support of a criminal complaint and arrest

warrant charging DORIS MOREL, ERIKA TOMASINO, BELKIS VASQUEZ, and JUAN

VASQUEZ, with violations of 18 U.S.C. §§ 371, 641, 1028A, 1341, and 1956(a)(1)(B)(i).

4.　　This Affidavit does not contain all the information obtained by your

affiant and other law enforcement agents in connection with this investigation.  Rather

it contains only that information which is necessary and sufficient to support a finding

of probable cause to issue arrest warrants for the above referenced crimes.  Further, this

Affidavit is made based upon my personal participation in this investigation; review of

various documents, including records maintained by the Internal Revenue Service;

information provided to me by other special agents of the IRS and other law

enforcement officers; my own training and expertise as a criminal investigator, as well

as the training and expertise of other criminal investigators involved with this

investigation.

## BACKGROUND

5.　　In 2012, members of law enforcement received information regarding a

Stolen Identity Refund Fraud ("SIRF") scheme which was operating in Pawtucket,

Rhode Island.   SIRF schemes involve the misuse of the Personal Identifying

Information ("PII") of individuals to file fraudulent federal tax returns.  The

fraudulently filed tax returns generate fraudulent refund checks which are obtained by

the perpetrators through the use of the United States Postal Service or through

Automated Clearing House ("ACH") deposits.  Based upon my training and

experience, I know that SIRF schemes commonly involve the misuse of Puerto Rican identities to file the fraudulent tax returns. Residents of Puerto Rico are not required to file tax returns and as a result, Puerto Rican identities are commonly purchased and sold on the black market for use in these schemes.

6.      The information received identified JUAN VASQUEZ (VASQUEZ), the owner of the "Dominican Market," which is located at 341 Lonsdale Avenue, Pawtucket, Rhode Island as the leader of the SIRF scheme.

7.      Using this information, I along with agents from the U.S. Secret Service and U.S. Postal Inspection Service, further investigated whether the Pawtucket SIRF scheme continued operating. The investigation confirmed the information received by law enforcement related to the Dominican Market and VASQUEZ. The investigation also identified additional co-conspirators including DORIS MOREL, ERIKA TOMASINO, and BELKIS VASQUEZ.

8.      During the years under investigation, (2010-2014), VASQUEZ was the owner of the Dominican Supermarket, located at 341 Lonsdale Avenue, Pawtucket, Rhode Island. To conceal his ownership of the business, VASQUEZ utilized nominees to open bank accounts and also to incorporate the business under various names including; "JV Supermarket," "MRJV Supermarket," "Dominican Supermarket," "Luciano & Sons LLC," and "Cibao Supermarket." Vasquez enlisted the assistance of family members, employees, friends, and others to assist in concealing the true ownership of the business and bank accounts.

9.      Through the use of the nominee bank accounts as well as bank accounts

in his own name, VASQUEZ and others including DORIS MOREL, ERIKA

TOMASINO, and BELKIS VASQUEZ, conspired to facilitate the negotiation of more

than four hundred fraudulently obtained treasury refund checks totaling approximately

$2,808,573.

10.     DORIS MOREL was a long-time employee at the Dominican Market.

MOREL worked at the market for approximately ten years and identified VASQUEZ as

the owner.  MOREL identified herself as the owner of "R&D Used Appliances" and

"Jovan Cleaning Supplies." MOREL was the signor on a bank account in the name of

Jovan Cleaning Supplies and had control of the R&D Used Appliance bank account,

which was opened by MOREL'S daughter at MOREL'S direction.  These accounts were

used in the scheme.

11.     ERIKA TOMASINO was also a long-time employee at the Dominican

Market and also identified VASQUEZ as the owner.  TOMASINO provided secretarial

and bookkeeping duties at the Dominican Market and worked there for approximately

ten years.  She also performed check cashing services on VASQUEZ'S behalf in a small

rented office adjacent to the Dominican Market.  TOMASINO was a signor on bank

accounts in the name of "El Mana Mini Market" and "RI Produce," both of which were

used in the scheme.

12.     BELKIS VASQUEZ is JUAN VASQUEZ'S sister.  BELKIS identified

VASQUEZ as the owner of the Dominican Market and also stated that VASQUEZ

controlled the business bank accounts.  BELKIS worked at the market for a period of

time and also identified DORIS MOREL as her best friend.  BELKIS was the account

signor on two bank accounts used in the scheme in the name of "Latinos Market LLC."

**BANK ANALYSIS**

13.    In addition to BELKIS VASQUEZ, MOREL, and TOMASINO, JUAN VASQUEZ also enlisted other individuals to assist in opening bank accounts and turning over control of the accounts directly to VASQUEZ.  These individuals include: R. G.(1), R.G.(2), G.S., E.M., N.G., H.S., and M.V.[1] Table 1 – Summary of Deposited Treasury Checks, summarizes the bank accounts and account holders that have a connection directly and/or indirectly to VASQUEZ, the Dominican Market, and the SIRF scheme being conducted by the co-conspirators.

14.    Table 1 summarizes the deposit activity of treasury refund checks into twenty-six separate bank accounts each of which is connected to VASQUEZ.  The source information contained on Table 1 was obtained via subpoenas, for bank records associated with the twenty-six bank accounts from three separate financial institutions. I analyzed the records received, and detailed the deposit and withdrawal items and learned that the treasury refund checks were deposited into the accounts between January 2010 and November 2014.


**Table 1, Summary of Deposited Treasury Checks**

---

[1] Initials are used to protect the privacy of non-targets in this investigation.  The full names are known to your affiant.  R.G.(1) and R.G.(2) are different individuals with same initials.

| | ACCOUNT NAME | ACCOUNT HOLDER | T-CKS DEPOSITED | DATE RANGE | TOTAL DOLLAR AMOUNT | TOTAL IDENTIFIED AS FRAUDULENT | CHECKS IDENTIFIED AS STOLEN |
|---|---|---|---|---|---|---|---|
| 1 | Latinos Market - 4386 | Belkis Vasquez | 35 | 10/05/2012-04/21/2014 | $ 224,547 | 27 | 2 |
| 2 | Latinos Market - 1125 | Belkis Vasquez | 22 | 07/19/2013-06/06/2014 | $ 131,557 | 19 | 1 |
| 3 | Jovan Cleaning Supplies | Doris Morel | 13 | 12/20/2013-04/23/2014 | $ 89,423 | 12 | - |
| 4 | R&D Used Appliances | E.A. | 18 | 11/05/2013-04/03/2014 | $ 120,393 | 17 | 1 |
| 5 | Mendez Cut's & Designs | E.M. | 9 | 01/13/2014-04/28/2014 | $ 65,087 | 5 | - |
| 6 | El Mana Mini Market | Erika Tomasino | 7 | 01/31/2014-04/28/2014 | $ 50,092 | 7 | - |
| 7 | RI Produce | Erika Tomasino | 7 | 11/18/2013-04/10/2014 | $ 53,118 | 7 | - |
| 8 | Pito's Landscaping | G.S. | 7 | 07/30/2014-10/27/2014 | $ 30,544 | 4 | 1 |
| 9 | "[H.S.]" | H.S. | 4 | 10/03/2013-12/24/2013 | $ 31,208 | 3 | - |
| 10 | Padilla Construction - 7783 | Juan Vasquez | 2 | 03/29/2013-06/20/2013 | $ 12,940 | 1 | - |
| 11 | Padilla Construction - 7791 | Juan Vasquez | 13 | 04/23/2013-07/25/2013 | $ 65,279 | 11 | - |
| 12 | JV Supermarket - 1813 | Juan Vasquez | 34 | 01/04/2010-09/03/2010 | $ 238,992 | 8 | - |
| 13 | JV Supermarket - 7963 | Juan Vasquez | 3 | 09/10/2010-09/27/2010 | $ 18,766 | 2 | - |
| 14 | JV Supermarket - 0552 | M.V. | 66 | 02/03/2011-06/01/2012 | $ 391,091 | 15 | - |
| 15 | MRJV Supermarket - 2152 | M.V. | 17 | 02/14/2011-12/31/2011 | $ 80,872 | 5 | - |
| 16 | Luciano & Sons - 8267 | M.V. | 14 | 07/19/2013-04/17/2014 | $ 79,108 | 11 | - |
| 17 | Luciano & Sons - 8526 | M.V. | 4 | 07/16/2013-09/10/2013 | $ 24,363 | 4 | - |
| 18 | Dominican Market - 7316 | M.V. | 13 | 02/15/2011-04/26/2011 | $ 70,014 | 5 | - |
| 19 | Cibao Supermarket - 4831 | N.G. | 55 | 10/01/2010-03/01/2012 | $ 358,770 | 21 | - |
| 20 | Cibao Supermarket - 4858 | N.G. | 37 | 10/21/2010-03/06/2012 | $ 232,793 | 18 | - |
| 21 | Cibao Supermarket - 4866 | N.G. | 32 | 10/18/2010-03/06/2012 | $ 190,793 | 18 | - |
| 22 | Cibao Supermarket - 9805 | N.G. | 6 | 09/12/2012-11/16/2012 | $ 41,340 | 1 | - |
| 23 | RG Cleaner - 9240 | R.G.(2) | 10 | 12/26/2013-04/28/2014 | $ 70,314 | 10 | - |
| 24 | RG Cleaner - 9313 | R.G.(2) | 5 | 01/16/2014-03/24/2014 | $ 36,477 | 5 | - |
| 25 | "[R.G.(2)]" | R.G.(2) | 2 | 10/15/2013-12/09/2013 | $ 15,867 | 2 | - |
| 26 | Vince Landscaping | R.G.(1) | 13 | 05/28/2014-11/06/2014 | $ 84,825 | 10 | 1 |
| | TOTAL | | 448 | | $ 2,808,573 | 248 | 6 |

15.     Your affiant and other Federal agents conducted verifications of sampled

treasury refund checks from each of the accounts listed in Table 1 to determine if the

treasury refund checks were fraudulently obtained and negotiated through the filing of

fraudulent Federal income tax returns.  Agents verified the veracity or lack thereof of

the tax returns through one of three methods; 1) direct contact with the taxpayer; 2)

direct contact with the taxpayer's purported employer; 3) comparison of the purported

employer identified on the tax return to information provided to the IRS by the genuine

employer.

16.     Of the four hundred and forty-eight treasury refund checks deposited to

the accounts, two hundred and sixty-one treasury refund checks were selected and

investigated further.  Using one or more of the verification methods described in the

preceding paragraph, it was determined that two hundred and forty-eight of the

sampled tax returns were identified as being fraudulent.

17.     The remaining thirteen tax returns were identified as being "legitimate",

meaning the information on the return was the genuine information of the taxpayer and

the thirteen treasury refund checks were not issued based on fraudulent

representations.  As described in paragraphs 18 – 21, further investigation of the

thirteen "legitimate" treasury refund checks revealed that six had been reported stolen

by the respective taxpayers and the remaining seven have not yet been further

investigated.

18.     On or about May 20, 2014, M.S. was interviewed by agents in the vicinity

of her residence located in Swansea, Massachusetts.  M.S. explained that she requested a

Thrift Savings Plan ("TSP") disbursement check[2] be mailed to Scottrade on her behalf. M.S. subsequently reviewed and identified a copy of a treasury TSP disbursement check made payable to M.S. in the amount of $22,459.79, as her check.  According to M.S., she never received the check and the endorsement on the reverse side is not her genuine endorsement.  M.S. went on to say that she had never heard of "Vince Landscaping" or "[R.G.(1)]," the account name and holder of the bank account into which the treasury check was deposited.

19.     On or about March 27, 2015, A.R. was interviewed by agents.  A.R. explained that she did not receive her 2013 treasury refund check.  A.R. reviewed a copy of the 2013 treasury refund check that was issued by the IRS but never received by her.  A.R. identified the check, payable to A.R., in the amount of $1,917 as her check.  A.R. reviewed the endorsement on the reverse side of the check and stated that it was not her genuine signature.  A.R. went on to say that she had never heard of "Pito Landscaping" or "[G.S]," the account name and holder of the bank account into which the treasury refund check was deposited.

20.     On or about July 1, 2015, A.R.(2) was interviewed telephonically.  A.R.(2) confirmed personal information such as his address and his social security number.  According to A.R.(2), he never received his refund check and when he followed up with the IRS, he was told that it had been deposited to a bank account belonging to a used appliance store.  SA Amsden explained to A.R.(2)  that a treasury refund check made

---

[2] The Thrift Savings Plan is a retirement planning vehicle for federal employees, similar to a 401(k) account. The United States treasury check payable to M.S. was not a tax refund check like the other checks discussed in this affidavit.  Instead, it was a check payable from the U.S. Treasury for the purpose of a TSP distribution.

payable to A.R.(2), in the amount $2,377.62 was deposited to a bank account in the name of "R&D Used Appliances," which was controlled by "DORIS MOREL." A.R.(2) stated that he had never heard of "R&D Used Appliances" or "DORIS MOREL."

21.     Three additional treasury refund checks were identified as having been stolen from the U.S. mail and fraudulently negotiated in accounts controlled by JUAN and BELKIS VASQUEZ. Treasury refund checks payable to C.P. in the amount $7,106 and H.V. in the amount $6,204.94 were deposited to Citizens Bank account number xxxx-4386 in the name of, "Latinos Market." Furthermore, a treasury refund check payable to J.N. in the amount $5,058.68 was deposited to Bank of America account number xxxx-xxxx- 1125 in the name of, "Latinos Market." Each of the three refund checks were reclaimed by the U.S. Treasury and equal amounts were debited from the Latinos Market accounts.[3]

22.     The bank accounts listed in Table 1 received deposits of items other than treasury refund checks. Other deposited items include, but are not limited to cash, EBT (food stamps), WIC redemptions (women, infant, children), and third-party payroll checks. It is your affiant's belief that the co-conspirators purposely deposited third-party payroll checks into the respective bank accounts with the intent to conceal the fraudulent nature of the SIRF scheme and the deposited treasury refund checks by

---

[3] According to the Treasury Financial Manual, Under Section 15 of the Federal Reserve Act of December 23, 1913, as amended (12 U.S.C. 391), and Section 10 of the Federal Reserve Act of June 11, 1942, as amended (12 U.S.C. 265), the Secretary of the Treasury sets forth regulations to the Federal Reserve Banks (FRBs) as Government depositaries and fiscal agents. If Treasury determines that a check has been paid over a forged or unauthorized endorsement, the Commissioner, Financial Management Service (FMS), may reclaim the amount of the check from the presenting bank or any other endorser that breached its guarantee of endorsement (31 CFR 240.8)

creating the appearance that the co-conspirators offered "check-cashing" services to the public.

23.     The same third-party individuals had payroll checks deposited to multiple bank accounts listed in Table 1.  For example, A.O.'s payroll checks were deposited to bank accounts in the name of El Mana Mini Market, Jovan Cleaning Supplies, R&D Used Appliances, Luciano & Sons, Dominican Imports, and Latinos Market.  A.O. was interviewed on May 28, 2015 and stated that she cashed checks at the Dominican Market located at 341 Lonsdale Avenue (Luciano & Sons is the legitimate business account for the Dominican Market.)  A.O. did not identify the other businesses as locations where she cashed her payroll checks.  Five additional witnesses including A.M., A.R.(3), J.A., K.L., and E.M., were interviewed between May 28, 2015 and June 11, 2015.  Each witness had payroll checks deposited to multiple accounts described in Table 1.  Similar to A.O., each of the five witnesses identified the Dominican Market as a location where they cashed payroll checks.

24.     It is your affiant's belief that the Dominican Market was a "hub" where third-party payroll checks were cashed by the general public.  From there the payroll checks were deposited to bank accounts listed in Table 1.  These accounts were in the names of various businesses, most of which were shell companies performing no legitimate service.  Based upon my training and experience, in particular as it relates to the investigation of money laundering and SIRF schemes, I believe that these third party checks were used to conceal the fraudulent treasury check scheme and to create the illusion that the businesses provided legitimate check cashing services to the public

when in fact it was merely an attempt to conceal the SIRF activity.

25.     Based upon interviews conducted throughout the investigation, it was established that the Dominican Market was in fact a location where the public cashed checks for a small fee.  The six individuals who were interviewed and further described in paragraph 23, lived and worked in the general area of the Dominican Market.  Of the four hundred and forty-eight treasury refund checks deposited to the accounts listed in Table 1, five checks were mailed to addresses in the State of Connecticut; thirty-six checks were mailed to addresses in the State of Massachusetts; five checks were mailed to addresses in the State of Maryland; two checks were mailed to addresses in the State of North Carolina; one check was mailed to an address in the State of New Hampshire; thirty-one checks were mailed to addresses in the State of New Jersey; one hundred and thirty-seven checks were mailed to addresses in the State of New York; eleven checks were mailed to addresses in the State of Pennsylvania; two hundred and fourteen checks were mailed to addresses in the State of Rhode Island; and two checks were mailed to addresses in the State of Virginia.  Treasury refund checks mailed to Rhode Island addresses made up approximately 47% of all of the treasury refund checks deposited to the accounts listed in Table 1.

26.     Many of the treasury refund checks deposited into the accounts listed in Table 1 were mailed to the same addresses and subsequently deposited to multiple accounts listed in Table 1.  For example, three treasury refund checks were mailed to 1100 Grant Ave, Apt 5, Bronx, NY.  The three treasury refund checks were deposited to Luciano & Sons account number xxxx-8267, Mendez Cut's & Designs account number

xxxx-xx-8928, and Latinos Market account number xxxx-4386.  Five treasury refund

checks were mailed to 111 North St, Apt 1, Jersey City, NJ.  The checks were deposited

to JV Supermarket xxx- 0552, Cibao Market xxxx- 4858, Cibao Market xxxx-4831, and

Cibao Market xxxx- 4866.  This pattern of directing multiple treasury checks mailed to a

single location and subsequently deposited to multiple bank accounts listed in Table 1

was a common occurrence in this scheme.

### NON-TARGET TESTIMONY

27.     E.A., whose identity is known to your affiant, provided testimonial

evidence on July 09, 2015.  E.A. testified that she lives in Central Falls with her mother,

DORIS MOREL, two brothers and her infant child.  E.A. went on to explain that she

opened Citizens Bank account number xxxx-9239 in the name of "R&D Used

Appliances," at the direction of MOREL.  According to E.A., R&D Used Appliances was

a store located in Providence which her mother owned and managed.  E.A. went on to

explain she had nothing to do with the business other than putting it in her name and

also that her mother had control of the debit card and checkbook associated with the

bank account.

28.     E.A. further testified that JUAN VASQUEZ is the owner of the Dominican

Market and that MOREL was a full-time employee at the market.  E.A. also stated that

she conducted cash withdrawals from the R&D Used Appliances account at the

direction of MOREL.  E.A. would then provide the cash to MOREL at the Dominican

Market where she worked.  According to E.A. she did not make deposits to the account,

instead it was MOREL who made the deposits.

29.     E.A. also went on to say that she and MOREL discussed opening a cleaning business called Jovan Cleaning supplies. According to E.A., she did not know if the business ever actually operated. During her testimony E.A. reviewed surveillance photographs and identified her mother making deposits to both Citizens Bank accounts in the name of R&D Used Appliances and Jovan Cleaning Supplies.

30.     R.G.(1) provided testimonial evidence on July 09, 2015. R.G.(1) testified that he has known VASQUEZ since 2000 and that he knows him through his ownership of his business. R.G.(1) went on to say that VASQUEZ approached him about opening a bank account because VASQUEZ told Roberto that he was having some issues with his business and the bank. VASQUEZ explained to R.G.(1) that he planned on using the account to make deposits with the money that was coming in to the business.

31.     R.G.(1) further testified that he opened Citizens Bank account number xxxx-3350 in the name of "Vince Landscaping," and subsequently turned over the debit card and checkbook to VASQUEZ. According to R.G.(1), VASQUEZ managed the account from that point on including making deposits to the account. R.G.(1) also stated that he signed blank checks in the checkbook that was provided to VASQUEZ and also that he accompanied VASQUEZ to the bank on several occasions.

32.     H.S. provided testimonial evidence on March 11, 2015. H.S. stated that he has known VASQUEZ for approximately ten years and that he became friends through hanging around the Dominican Market. H.S. explained that he ran errands for VASQUEZ including going to the bank. H.S. further explained that the Dominican Market cashed checks and that VASQUEZ and two employees, DORIS MOREL and

ERIKA TOMASINO, provided H.S. with checks and deposit slips which H.S. would then bring to the bank. According to H.S., VASQUEZ and MOREL would drive him to the bank and wait while he made the deposits.

33.     H.S. further testified that VASQUEZ approached him about opening a bank account for VASQUEZ. H.S. explained that VASQUEZ told him that the store didn't have any money, and that as a favor to VASQUEZ, he needed H.S. to open a bank account. Together, H.S. and VASQUEZ went to Citizens Bank and H.S. opened account number xxxx-3923 in the name of H.S. VASQUEZ then took the debit card and checkbook associated with the account H.S. opened and VASQUEZ also directed H.S. to sign the checks in the checkbook.

34.     Surveillance images obtained from Citizens Bank depict H.S. conducting deposits and/or withdrawals in the following bank accounts; Luciano and Sons, El Mana Mini Market, Latinos Market, L.L. (Discussed later), R&D Used Appliances, RG Cleaners, RI Produce, and Jovan Cleaning Supplies.

35.     G.S. provided testimonial evidence on March 11, 2015. G.S. identified VASQUEZ as the owner of the Dominican Market and explained that he and VASQUEZ were friends. According to G.S. he began working at the Dominican Market in 2014 in many capacities including cleaning, general repair, and working with the food.

36.     G.S. further testified that he was approached by VASQUEZ about opening a bank account for VASQUEZ. According to G.S., VASQUEZ told him that the bank had closed his account and that as a favor, he needed G.S. to open one for him. G.S.

explained that VASQUEZ drove him to a Citizens Bank branch and directed him to

open an account in the name, "Pito's Landscaping." G.S. subsequently opened account

number xxxx-4633 in the name of Pito's Landscaping. After the account was opened,

G.S. provided the debit card and the checkbook to VASQUEZ and also signed blank

checks at VASQUEZ'S direction. G.S. also explained that VASQUEZ told him not to tell

anyone about the bank account he had opened.

37.     E.M. provided testimonial evidence on March 11, 2015. E.M. testified that

she has known VASQUEZ for approximately eighteen years and that on occasion she

worked at the store cooking and cleaning if VASQUEZ needed her help.

38.     E.M. further testified that VASQUEZ offered to help E.M. increase her

credit score by opening a bank account together. According to E.M., VASQUEZ

explained that he would make deposits to the account and since large sums of money

were going into the account, it would subsequently increase her credit score.

39.     E.M. stated that VASQUEZ was with her when she opened Citizens Bank

account number xxxx-xx-8928 in the name of, "Mendez Cut's & Designs." After the

account was opened, E.M. provided the debit card and a series of temporary checks to

VASQUEZ after VASQUEZ directed her to sign the blank temporary checks. E.M.

further stated that she did not make any deposits to the bank account.

40.     R.G.(2) provided testimonial evidence on July 09, 2015. R.G.(2) testified

that he has known VASQUEZ for many years and that they were best friends.

According to R.G.(2), VASQUEZ proposed starting a cleaning business with R.G.(2),

and R.G.(2) subsequently opened Citizens Bank account numbers xxxx-9240 and xxxx-

9313, both in the name of, "R.G.(2) DBA RG Cleaners." After the accounts were opened, R.G.(2) signed a book of blank checks and provided the debit cards and checkbooks to VASQUEZ.

41.     R.G.(2) further testified that despite opening the business bank accounts, they never purchased equipment, secured customers, or made any money. VASQUEZ however, R.G.(2) explained, used the bank accounts to negotiate checks which R.G.(2) delivered to the bank at VASQUEZ'S direction. According to R.G.(2), VASQUEZ would hand him a packet containing the checks that needed to be deposited and R.G.(2) would bring the packet to the bank.

42.     R.G.(2) also stated that he opened Citizens Bank account number xxxx-9305 in the name of, "Dominican Imports." According to R.G.(2), Dominican Imports was another company that VASQUEZ proposed to him. The purpose was to buy a large truck and to provide moving and transportation services. R.G.(2) testified that he was not aware that between February 24th and April 30th, 2014, the Dominican Imports account received approximately $43,035 in transferred funds from an account in the name of El Mana Mini Market nor had R.G.(2) ever heard of El Mana Mini Market.

43.     R.G.(2) also testified that when he and VASQUEZ were discussing the proposed business accounts, R.G.(2) allowed VASQUEZ to use his personal bank account, Citizens Bank account number xxxx-3155. Two treasury refund checks totaling approximately $15,867 were deposited to this account, yet R.G.(2) stated that he did not deposit the checks.

44.     N.C. provided testimonial evidence on March 11, 2015. N.G. testified that

he has known VASQUEZ for approximately twenty years and that he has worked at the

Dominican Market for eight or nine years. N.G. also stated that MOREL works as a

cashier and TOMASINO is VASQUEZ'S secretary.

45. N.G. further testified that VASQUEZ asked if he could put the Dominican

Market in N.G.'s name. N.G. obliged and saw it as a nice gesture and a job opportunity.

N.G. went on to explain that he also opened bank accounts at Citizens Bank and Bank of

America for VASQUEZ as well. According to N.G., he opened Citizens Bank account

numbers xxxx-4866, xxxx-4858, xxxx-4831 all of which were in the name, "Cibao

Supermarket," in addition to Bank of America account number xxxx-xxxx-1805 which

was also in the name of, "Cibao Supermarket." N.G. recalled going to the bank on

multiple occasions with TOMASINO to open the bank accounts and also on one

occasion with VASQUEZ. TOMASINO and VASQUEZ sat with N.G. while the

accounts were opened and N.G. testified that they must have taken the debit cards and

checkbooks at that time because N.G. never possessed them. In total, N.G. opened four

bank accounts in the name of Cibao Supermarket, all at the direction of VASQUEZ.

46. N.G. also stated that the Dominican Market provided check cashing

services to the customers. N.G. cashed payroll checks ranging from $300-500, but he

never cashed a treasury refund check or any check in excess of $500. N.G. went on to

explain that VASQUEZ directed him to make deposits at the bank. VASQUEZ would

prepare a bag and give it to N.G. to deposit. N.G. recalled seeing treasury checks in the

bags that VASQUEZ provided to him.

47. N.C. testified that VASQUEZ was the manager of the Dominican Market

and that his sister, M.V., owns the business. According to N.G., VASQUEZ stopped

showing up at work at the same time investigators started interviewing witnesses. N.G.

has not seen or heard from VASQUEZ since then.

48.     Jose Gomez provided testimonial evidence on March 11, 2015. Gomez

testified that he has worked at the Dominican Market since 1998 and that VASQUEZ

was his boss for that entire time period. Gomez also explained that around

Thanksgiving, 2014, investigators went to the Dominican Market looking for VASQUEZ

and after that, VASQUEZ left the Dominican Market and with the assistance of his

sister, BELKIS VASQUEZ, he went to live in Tampa, Florida.

### DORIS MOREL

49.     MOREL was interviewed by agents on November 6, 2014. During the

interview MOREL identified VASQUEZ as the owner of the Dominican Market and she

also stated that she worked at the market for approximately ten years. According to

MOREL, she also operated R&D Used Appliances and Jovan Cleaning Supplies. Morel

opened Citizens Bank account number xxxx-6830 in the name of, "Jovan Cleaning

Supplies," and directed her daughter to open Citizens Bank account number xxxx-9239

in the name of, "R&D Used Appliances."

50.     MOREL explained that R&D Used Appliances was a failure and that she

sold very few appliances. According to MOREL, a woman she identified initially as

"Rosa," told her that she could make money cashing checks. Later in the interview

MOREL stated that the woman's name was "Ana," not Rosa. At Ana's

recommendation, MOREL claims that she placed a sign in the window of R&D Used

Appliances indicating that the store cashed checks and after that customers began bringing checks to the store to be cashed.

51.     The Citizens Bank accounts in the name of R&D Used Appliances and Jovan Cleaning Supplies were used to negotiate third-party payroll checks in addition to treasury refund checks.  A.O., A.M., A.R.(3), E.M., J.A., and K.L., each had payroll checks deposited to one or both of the two accounts.  The six witnesses were interviewed by agents and contrary to MOREL'S claim that customers brought their checks to R&D Used Appliances, these individuals stated that they did not cash their checks at R&D Used Appliances and had never heard of the store.  Each of the six individuals had cashed their payroll checks at the Dominican Market.

52.     Treasury refund checks made up approximately 77% of all deposits made to the R&D Used Appliances account and 77% of all deposits made to the Jovan Cleaning Supplies account as well.  Moreover, MOREL continued to deposit or cause to be deposited, fraudulent treasury checks into these two accounts even after the funds associated with one check were reclaimed by the Treasury for fraud.  Based upon my training and experience, and the deposit and withdrawal activity I observed in both accounts, I believe that these two accounts served no legitimate purpose and were designed as shell companies for the sole purpose of concealing the nature of the SIRF scheme.

53.     As previously discussed in paragraph 26, some of the mailing addresses on the treasury refund checks were used multiple times.  For example, a treasury refund check payable to M.M.R in the amount, $9,245 was deposited to the R&D Used

Appliances account. The treasury refund check was mailed to 12 Lois Ave, Apt 3, Providence, Rhode Island. A second treasury refund check, mailed to the same address and made payable to E.M.R. in the amount, $9,275 was deposited to a Citizens Bank account in the name of, "RI Produce," which belongs to ERIKA TOMASINO.

54. Another address that was used also shows a connection between MOREL and TOMASINO. A treasury refund check made payable to H.M. in the amount $8,210 was mailed to 120 Westview St, Apt 7, Dorchester, MA and was deposited to the R&D Used Appliances account. A Second treasury refund check mailed to the same address, made payable to V.M.J. in the amount $7,542 was deposited to the El Mana Mini Market account which is held by TOMASINO. There was also a third treasury refund check mailed to 122 Westview St, Apt 9, Dorchester, MA, which was deposited to the Jovan Cleaning Supplies account.

55. An investigator from Citizens Bank has provided your affiant's with numerous surveillance images related to this investigation. DORIS MOREL can be observed in the surveillance images transacting deposits and or withdrawals in the following accounts; R&D Used Appliances, Jovan Cleaning Supplies and El Mana Mini Market. MOREL is the signor on the Jovan Cleaning Supplies account, her daughter, E.A., is the signor on the R&D Used Appliances account, and ERIKA TOMASINO is the signor on the El Mana Mini Market account.

56. On December 20, 2013, a treasury refund check payable to N.C.A. in the amount $6,587 was deposited to Citizens Bank account number xxxx-6830 in the name of, "Jovan Cleaning Supplies." Your affiant has confirmed that the treasury refund

check was issued based of fraudulent representations contained on the Federal tax return that was filed. A Citizens Bank surveillance image captured on December 20, 2013, depicts MOREL as the depositor of the check.

57.     On December 30, 2013, a treasury refund check payable to A.R. in the amount $2,377.62 was deposited to Citizens Bank account number xxxx-9239 in the name of, "R&D Used Appliances." Your affiant has confirmed that the treasury refund check was stolen from the U.S. mail. A Citizens Bank surveillance image captured on December 30, 2013, depicts MOREL as the depositor of the check.

### ERIKA TOMASINO

58.     TOMASINO was interviewed by agents on November 6, 2014. During the interview TOMASINO identified VASQUEZ as the owner of the Dominican Market and she also stated that she works as a secretary at the Dominican Market. TOMASINO explained that VASQUEZ attempts to shield his ownership of the Dominican Market by putting the business and bank accounts in other peoples' names. According to TOMASINO, she is the owner and account signor on Citizens Bank account number xxxx-9461 in the name of, "El Mana Mini Market" and she is also a co-signor on Citizens Bank account number xxxx-7179 in the name of, "RI Produce."

59.     TOMASINO explained that part of her job working at the Dominican Market was to cash customers' checks. VASQUEZ provided TOMASINO with the cash to use for this service, but on occasion, TOMASINO would have to use her own funds. TOMASINO explained that if she used her own funds to cash a treasury refund check, she would subsequently deposit the check to the bank account in the name, "RI

Produce." TOMASINO also stated that she utilized the bank account in the name, "El
Mana Mini Market" to cash customers' checks.

60.     TOMASINO explained to agents that she transferred funds from the El
Mana Mini Market account to a bank account in the name, "Dominican Imports."
According to TOMASINO, the Dominican Imports bank account was in the name of
R.G.(2), but used for the benefit of VASQUEZ. Between February 24th and April 30th,
2014, TOMASINO transferred approximately $43,035 from the Citizens Bank, El Mana
Mini Market account to the Dominican Imports account. Between January 31st and
April 28, 2014, approximately $50,092 of treasury refund checks was deposited to the El
Mana Mini Market account.

61.     TOMASINO stated to agents that she pays VASQUEZ'S bills using a
checkbook in the name of, "L.L." According to TOMASINO, the checkbook was
provided to her by VASQUEZ and he directed TOMASINO to use the checks to pay for
VASQUEZ'S personal bills. TOMASINO stated that she has never met L.L. and does
not know why VASQUEZ directed her to do this, yet she complied with VASQUEZ'S
directions. TOMASINO produced the checkbook for the agents to inspect. The
checkbook was subsequently turned over to agents on November 13, 2014, pursuant to
the service of a subpoena.

62.     On December 27, 2013, treasury refund check number 4034 02723189
made payable to J.R.M. in the amount $9,579 was deposited to Citizens Bank account
number xxxx-7179 in the name of, "El Mana Mini Market." J.R.M. was interviewed by
agents in Ponce, Puerto Rico on June 16, 2015. According to J.R.M. he did not file a

Federal income tax return with the IRS. J.R.M. reviewed copies of treasury refund check number 4034 02723189 and the tax return that was filed with the IRS that generated the refund check. J.R.M. stated that he did not recognize the signature on the check and that he did not file the tax return displayed to him.

63.     On December 20, 2013, a treasury refund check payable to A.O.M. in the amount $5,865 was deposited to Citizens Bank account number xxxx-9461 in the name of, "El Mana Mini Market LLC." Your affiant has confirmed that the treasury refund check was issued based of fraudulent representations contained on the Federal tax return that was filed. On May 7, 2014, A.O.M. was interviewed telephonically. A.O.M. confirmed the fraudulent representations on the tax return and stated that she did not file the tax return in question.

64.     As previously discussed in paragraphs 53 and 54, treasury refund checks payable to the same addresses, 12 Lois Ave, Apt 3, Providence, Rhode Island, and 120 Westview St, Apt 7, Dorchester, MA, were deposited to accounts controlled by TOMASINO and MOREL.

65.     Surveillance images obtained from Citizens Bank depict TOMASINO transacting deposits and/or withdrawals from the following accounts; El Mana Mini Market, RG Cleaners, and RI Produce.

66.     Also during the interview, TOMASINO identified her home address as 50 Perry Street, Central Falls, Rhode Island. TOMASINO'S Rhode Island driver's license also lists the same address as her residence. Three treasury refund checks involved in this case were mailed to this address. Each of the three treasury refund checks were

verified as fraudulent. Two of the treasury refund checks were deposited to the JV Supermarket account ending in 0552 and the other check was deposited to the Cibao Market bank account ending in 4866.

67.     Further, I conducted queries using the Financial Crimes Enforcement Network's (FINCEN) Money Service Business Registrant Search Web Page and learned that neither R&D Used Appliances, El Mana Mini Market, or Jovan Cleaning Supplies, or the respective account holders were licensed with the Secretary of treasury as money transmitting businesses. See 31 U.S.C. §§ 5322 and 5330 (imposing civil liability on business owners who provide check cashing services without registering with the Secretary of treasury and criminal liability on business owners that willfully violate the registration requirement).

## BELKIS VASQUEZ

68.     BELKIS VASQUEZ was interviewed on two occasions, February 26th and May 21st, 2015. During the interviews BELKIS acknowledged opening Citizens Bank account number xxxx-4386 in the name of, "Latinos Market," Citizens Bank account number xxxx-9191 in the name of, "BELKIS VASQUEZ," and Bank of America account number xxxx-xxxx-1125 in the name of, "Latinos Market."

69.     BELKIS VASQUEZ identified VASQUEZ as her brother and the operator of the Dominican Market despite the fact that VASQUEZ put the store in the names of other individuals including N.G. and M.V. BELKIS further explained that VASQUEZ controlled all of the bank accounts associated with the Dominican Market as well.

70.     According to BELKIS, she and MOREL are best friends. BELKIS also

knows TOMASINO and the three of them have discussed the investigation of VASQUEZ together.

71.     BELKIS explained that VASQUEZ approached her about opening a grocery store in Central Falls, Rhode Island.  According to BELKIS, VASQUEZ offered to purchase the store and put it in BELKIS' name.  BELKIS agreed and the two subsequently opened Latinos Market on Dexter Street in Central Falls.

72.     BELKIS stated that the checkbooks for the Latinos Market bank accounts at Citizens Bank and Bank of America were in VASQUEZ'S possession. BELKIS maintained possession of the Citizens Bank debit card, but VASQUEZ frequently used it too. The debit card related to the Bank of America account was in VASQUEZ'S possession, but on occasion VASQUEZ would direct BELKIS to make cash withdrawals from the account.

73.     BELKIS stated that she also had a personal bank account at Citizens Bank. According to BELKIS, VASQUEZ directed her to make transfers from the Latinos Market account to her personal account.  A total of $161,538 was transferred from Citizens Bank account number xxxx-4386 in the name of Latinos Market to Citizens Bank account number xxxx-9191 in the name of BELKIS VASQUEZ, between November 9th, 2012 and April 15th, 2014.  During this same time frame, approximately $210,543 in treasury refund checks were deposited to Latinos Market account number xxxx-4386, the same account from which the transfers were made.

74.     BELKIS stated that she used Citizens Bank account number xxxx-9191 to provide for her family.  Most of the charges, including Amazon, restaurants,

playstation, riotgames, etc., were made by her and her children.  BELKIS also stated that

VASQUEZ would ask BELKIS for the debit card on occasion.  Furthermore, BELKIS

stated that VASQUEZ allowed BELKIS to use the money to make a tuition payment to

the Community College of Rhode Island for her son's education. According to BELKIS,

VASQUEZ allowed her to use the funds transferred to her personal account as payment

for the work she did operating Latinos Market.

75.     BELKIS identified one of her previous addresses as, 326 Cowden Street,

Central Falls, Rhode Island.  BELKIS explained that she lived on the third floor for a

period of time and the second floor for a period of time as well.  Four of the four

hundred and forty-eight treasury refund checks identified in this scheme were mailed

to two addresses on Cowden Street, one of which was mailed directly to 326 Cowden

Street.[4] This particular check, made payable to E.M.C., was deposited to Citizens Bank

account number xxxx-4831 in the name of, "Cibao Market."

76.     The three other checks were mailed to 373 Cowden Street, Central Falls,

Rhode Island.  These three treasury refund checks were deposited to Citizens Bank

account numbers xxxx-4831 and xxxx-4858 both in the name of, "Cibao Market" and

also to Domestic Bank account number xx-0552 in the name of, "JV Supermarket."  Each

of these three bank accounts were controlled by VASQUEZ.

77.     BELKIS identified 106 Columbia Ave, Pawtucket, Rhode Island and 71

Hawes Street, Central Falls, Rhode Island as VASQUEZ'S most recent addresses.

---

[4] Treasury refund check number 2310 47469917 payable to E.M.C. in the amount $6,255.00 was mailed to
326 "Couden" Street, 1st Floor, Central Falls, RI 02863.  A search of public records shows that there is no
"Couden" street in Central Falls and it is your affiant's belief that this is a misspelling of "Cowden" street.

BELKIS also explained that she believes VASQUEZ left Rhode Island when he learned of the investigation and she has heard that he is living in Florida.

### JUAN VASQUEZ

78.     VASQUEZ is the account signor on four of the bank accounts identified in Table 1. VASQUEZ is the signor on Citizens Bank account numbers xxxx-7783 and xxxx-7791 both in the name of, "Padilla Construction." VASQUEZ is also the signor on Citizens Bank account numbers xxxx-7963 and xxxx-1813 which are both in the name of, "JV Supermarket Inc."

79.     VASQUEZ appears to have illegally commandeered Citizens Bank account number xxxx-3182 in the name of, "L.L." L.L. provided testimonial evidence on December 3, 2014. L.L. testified that he has lived in Atlanta, Georgia for approximately ten years. L.L. identified VASQUEZ as the owner of the Dominican Market and the god-father to his children.

80.     According to L.L., in 2011, L.L. came to Rhode Island for a period of five days to visit his son. During this time, L.L. stayed with VASQUEZ and contemplated returning to Rhode Island. While he was in Rhode Island, L.L. decided to open a bank account in the event that he permanently relocated to Rhode Island. VASQUEZ suggested to L.L., opening an account at Citizens Bank because VASQUEZ had his business and personal accounts there and stated that it was a good bank. VASQUEZ and L.L. went to Citizens Bank together and L.L. opened account number xxxx-3182 in the name of, "L.L.," with a $100 deposit.

81.     L.L. also testified that he received a folder of information from Citizens

Bank including a debit card and the corresponding password. L.L. provided the folder

and its contents to VASQUEZ for safekeeping in his safe until L.L. decided whether or

not he would be re-locating to Rhode Island. L.L. returned to Georgia and decided not

to return to Rhode Island. The Citizens Bank folder and contents remained in

VASQUEZ'S possession. L.L. testified that aside from the initial $100 deposit, he never

accessed the account again. He said that he did not give VASQUEZ or any of

VASQUEZ'S family members' permission to use the account. According to L.L., when

he realized that his account was being used without his permission, approximately

eight months after it was opened, L.L. called BELKIS VASQUEZ and spoke to her about

it.

82.     Citizens Bank was served a subpoena for records related to the L.L. bank

account. An analysis of the records provided indicate the following deposited items;

cash deposits totaling approximately $164,901, checks drawn on Cibao Supermarket

accounts totaling $36,546, checks from Dominican Market totaling $26,467, checks from

G.S. d/b/a Pito Landscaping totaling $7,350, checks from JV Supermarket totaling

$95,660, checks from JUAN VASQUEZ totaling $41,880, checks from Latinos Market

totaling approximately $48,968, checks from Mendez Cut's & Designs totaling $10,885, a

check from Padilla Construction totaling $4,000, checks from R.G.(2) d/b/a RG Cleaner

totaling $10,700, checks from Vince Landscaping totaling $11,350, and other deposits.

83.     Debits from the L.L. account include living expenses such as, autozone,

BJ's Wholesale, City of Central Falls, Cox Communications, Cumberland Farms,

General Foods, Gulf Oil, National Grid, Pricerite, and others. Other debits from the L.L.

account include ATM withdrawals totaling approximately $17,500 and checks written

to JUAN VASQUEZ totaling $26,200.

84.     The L.L. account also appears to have been used to move funds to two

bank accounts at Banco Santa Cruz, a bank which is domiciled in the Dominican

Republic.  Twenty-six checks payable to Banco Santa Cruz totaling $40,609 were drawn

on the account.  There are also numerous checks made payable to nominees which were

deposited at Banco Santa Cruz in the Dominican Republic.  In total, $235,493 were

transferred to the two accounts at Banco Santa Cruz.

85.     Finally, thirty-nine checks totaling approximately $188,264 made payable

to M&T Bank were also drawn on the L.L. account.  Records obtained from M&T Bank

indicate that the payments from the L.L. account were for the purpose of mortgage

payments related to the property located at 339-341 Lonsdale Ave, Pawtucket, Rhode

Island, which is the real estate location of the Dominican Market.  The M&T Bank

records indicate the owner of the property as JUAN VASQUEZ.

86.     Surveillance images provided to your affiant by Citizens Bank depict

VASQUEZ making deposits and/or withdrawals to the following bank accounts;

Luciano & Sons, L.L., and RG Cleaners.  Other depositors identified conducting

transactions to the L.L. account include R.G.(2) and H.S.

87.     A Citizens Bank surveillance image captured on March 24, 2014, depicts

VASQUEZ making a deposit to Citizens Bank account number xxxx-9313 in the name of

R.G.(2) DBA RG Cleaners.  VASQUEZ can be observed depositing treasury refund

check number 4034 09592082 made payable to L.A.M., in the amount $6,073.

88.    L.A.M. was interviewed in Bayamon, Puerto Rico, by agents on June 23,

2015. L.A.M. stated that he has not filed Federal income tax returns with the IRS nor

did he give anyone permission to do so. L.A.M. reviewed copies of treasury refund

check number 4034 09592082 and the tax return that was filed with the IRS that

generated the refund check. L.A.M. stated that he did not recognize the signature on

the check as his own and that he did not file the tax return displayed to him.

89.    In addition to the bank accounts previously discussed that VASQUEZ is a

signor on, VASQUEZ was also a signor on Citizens Bank checking account number

xxxx-0366. According to Citizens Bank Personal Signature Card, the account was

opened by VASQUEZ on October 4, 2011.

90.    An analysis of records related to account number xxxx-0366 indicate that

on September 10, 2013, check number 1018345 drawn on First California Bank and made

payable to D.S. in the amount $8,757.59 was deposited to the account. The front of the

check lists an address for D.S. at 552 West 186 St, Apt 44, New York, NY 10033.

91.    On June 17, 2015, Postal Inspectors interviewed D.S. at her home in

Ossining, New York. A copy of the check was displayed for D.S. to inspect. D.S.

explained that the address on the check belongs to her estranged husband's father. D.S.

was not familiar with VASQUEZ and stated that the signature on the check was not her

genuine signature.

92.    Evidence collected during the course of the investigation indicates that

VASQUEZ fled to the State of Florida at the time he learned of the investigation. Prior

to VASQUEZ leaving the State of Rhode Island, his two most recent addresses were 106

Columbia Avenue, Pawtucket, Rhode Island and 71 Hawes Street, Central Falls, Rhode Island.

93.     Your affiant has reviewed tax return information related to dozens of tax returns claiming refunds requested to the two addresses identified in the preceding paragraph.  The tax return information is related to current year filings (tax year 2014) and the three previous tax years.  Your affiant has also learned that the Internal Revenue Service utilizes safeguards and controls to identify and prevent the release of treasury refund checks issued on the basis of fraudulent information.   As will be further discussed in the following paragraphs, dozens of treasury refund checks were requested to be mailed to both 106 Columbia Avenue and 71 Hawes Street, but were not released due to the use of IRS fraud prevention measures.

94.     The following information is related to treasury refund checks that were requested to be mailed to 106/108 Columbia Ave, Pawtucket, Rhode Island, which is a multi-family residence.  During prior year three, twenty-five treasury refund checks totaling $127,011 were requested.  Of the twenty-five requested checks, only two checks were released.  The remaining twenty-three checks were not released due to the effectiveness of IRS controls.  During prior year two, sixteen treasury refund checks were requested totaling $71,466.  Of the sixteen treasury refund checks requested, only three were released.  During prior year one, eighteen treasury refund checks totaling $74,595 were requested.  Of the eighteen checks requested, only six refunds were released.  During the current year tax filing, after VASQUEZ learned of the investigation, two treasury refund checks were requested and both were released.

95.    The following information is related to treasury refund checks that were requested to be mailed to 71/73 Hawes Street, Central Falls, Rhode Island, which is a multi-family residence.  During prior year three, twenty-one treasury refund checks totaling $140,692 were requested.  Of the twenty-one requested checks, only one check was released.  The remaining twenty checks were not released due to the effectiveness of IRS controls.  During prior year two, forty-four refund checks totaling $238,348 were requested.  Of the forty-four treasury refund checks requested, only three were released.  During prior year one, fifteen treasury refund checks totaling $91,952 were requested.  Of the fifteen checks requested, only two refunds were released.  During the current year tax filing, after VASQUEZ learned of the investigation, two treasury refund checks were requested and both were released.

## CONCLUSION

Based on the foregoing, and my training and experience, I believe that there is probable cause to believe that JUAN VASQUEZ, DORIS MOREL, ERIKA TOMASINO, and BELKIS VASQUEZ committed numerous violations of federal law, including conspiracy, in violation of 18 U.S.C. § 371; theft of government property, in violation of 18 U.S.C. § 641; mail fraud, in violation of 18 U.S.C. § 1341; aggravated identity theft, in violation of 18 U.S.C. 1028A; and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Accordingly, I request arrest warrants be issued for JUAN VASQUEZ, DORIS MOREL, ERIKA TOMASINO and BELKIS VASQUEZ for the above-listed offenses.

Matthew R. Amsden
Special Agent
Internal Revenue Service-Criminal
Investigation


Subscribed and sworn before me this ___8___ day of
September, 2015 in Providence, Rhode Island.

LINCOLN D. ALMOND
United States Magistrate Judge
District of Rhode Island

PER 18 U.S.C. 3170

**DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT**

BY: ☐ INFORMATION   ☐ INDICTMENT   ☒ COMPLAINT     CASE NO. *1:15 MJ 295 A*

Matter Sealed:   ☐ Juvenile   ☐ Other than Juvenile
☐ Pre-Indictment Plea   ☐ Superseding
☐ Indictment   ☐ Defendant Added
☐ Information   ☐ Charges/Counts Added

USA vs.

Defendant: Juan Vasquez

Ad: **REDACTED**

Name of District Court, and/or Judge/Magistrate Location (City)

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND   RHODE ISLAND
Divisional Office

Name and Office of Person   PETER F. NERONHA
Furnishing Information on   ☒ U.S. Atty   ☐ Other U.S. Agency
THIS FORM   Phone No. (401) 709-5000
Name of Asst.
U.S. Attorney
(if assigned)   John P. McAdams

☒ Interpreter Required   Dialect: Spanish

**REDACTED**   ] Alien
applicable)

**PROCEEDING**

Name of Complainant Agency, or Person (& Title, if any)
Internal Revenue Service (IRS)

☐ person is awaiting trial in another Federal or State Court
(give name of court)

☐ this person/proceeding transferred from another district
per (circle one) FRCrP  20, 21 or 40. Show District

☐ this is a reprosecution of charges
previously dismissed which were
dismissed on motion of:
☐ U.S. Atty   ☐ Defense

☐ this prosecution relates to a
pending case involving this same
defendant. (Notice of Related
Case must still be filed with the
Clerk.)

☐ prior proceedings or appearance(s)
before U.S. Magistrate Judge
regarding this defendant were
recorded under

SHOW
DOCKET NO.

MAG. JUDGE
CASE  NO.

Place of
offense   RHODE ISLAND   County

**DEFENDANT**

Issue: ☒ Warrant   ☐ Summons

Location Status:

Arrest Date_____ or Date Transferred to Federal Custody_____

☐ Currently in Federal Custody
☐ Currently in State Custody
  ☐ Writ Required
☐ Currently on bond
☐ Fugitive

Defense Counsel (if any): _____

☐ FPD   ☐ CJA   ☐ RET'D
☐ Appointed on Target Letter

☐ This report amends AO 257 previously submitted

**OFFENSE CHARGED - U.S.C. CITATION - STATUTORY MAXIMUM PENALTIES - ADDITIONAL INFORMATION OR COMMENTS**

Total # of Counts_____

| Set | Title & Section/Offense Level (Petty = 1 / Misdemeanor = 3 / Felony = 4) | Description of Offense Charged | Felony/Misd. |
|-----|----------------------|-------------------------------|--------------|
|  | See Attachment |  | ☐ Felony ☐ Misdemeanor |
|  |  |  | ☐ Felony ☐ Misdemeanor |
|  |  |  | ☐ Felony ☐ Misdemeanor |
|  |  |  | ☐ Felony ☐ Misdemeanor |
|  |  | Trial: 1 week | ☐ Felony ☐ Misdemeanor |

## OFFENSE CHARGED – U.S.C. CITATION – STATUTORY MAXIMUM PENALTIES – ADDITIONAL INFORMATION OR COMMENTS

Total # of Counts: **5**

| Set | Title & Section/Offense Level (Petty = 1/ Misdemeanor = 3/ Felony = 4) | Description of Offense Charged | Felony/Misd. |
|---|---|---|---|
| 1 | 18 U.SC. 371 | Conspiracy to commit offenses against United States | **FELONY** |
|  | Imprisonment: 5 yrs; Supervised release: 3 yrs; Fine: $250,000; Special Assessment: $100 |  |  |
| 1 | 18 U.S.C. 641 | Theft of government property | **FELONY** |
|  | Imprisonment: 10 yrs; Supervised release: 3 yrs; Fine: $250,000; Special Assessment: $100 |  |  |
| 1 | 18 U.S.C. 1341 | Mail fraud | **FELONY** |
|  | Imprisonment: 20 yrs; Supervised release: 3 yrs; Fine: $250,000; Special Assessment: $100 |  |  |
| 1 | 18 U.S.C. 1028A | Aggravated identity theft | **FELONY** |
|  | Imprisonment: 2 yrs; Supervised release: 3 yrs; Fine: $250,000; Special Assessment: $100 |  |  |
| 1 | 18 U.S.C. 1956(a)(1)(B)(i) | Money laundering in violation | **FELONY** |
|  | Imprisonment: 20 yrs; Supervised release: 0 yrs; Fine: $250,000; Special Assessment: $100 |  |  |